## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>450 Fifth Street, NW, Suite 8000<br>Washington, DC  20530<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED CONTINENTAL HOLDINGS,<br>INC.,<br>233 S. Wacker Drive<br>Chicago, IL  60606<br><br>and<br><br>DELTA AIR LINES, INC.,<br>1030 Delta Boulevard<br>Atlanta, GA 30354<br><br>*Defendants*. | Case No. |

## VERIFIED COMPLAINT

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil antitrust action to enjoin the proposed acquisition of additional airport takeoff and landing slots at Newark Liberty International Airport ("Newark") by the dominant airline at that airport, United Continental Holdings, Inc. ("United").

## I.    INTRODUCTION

1.      Over 35 million passengers fly in and out of Newark each year to destinations across the United States and around the world.  Newark serves the New York-New Jersey metropolitan area and is the most convenient airport for passengers

1

traveling to or from locations in populous Northern New Jersey and portions of Manhattan. To serve Newark, an airline must have "slots," which are takeoff and landing authorizations issued by the Federal Aviation Administration ("FAA") to manage airport congestion and delay.

2.      Air passengers flying out of Newark pay among the highest fares in the country. United is the monopoly nonstop provider to 139 of the 206 destinations served nonstop from Newark, and already controls 902 (or 73%) of the 1,233 slots the FAA has allocated to airlines at the airport—over 10 times more slots than the next largest airline. No other airline controls more than 70 slots.



3.      United does not use all of the slots it controls at Newark. Each day, it "grounds" as many as 82 slots at Newark—more slots than any of its competitors have the option to fly. United's failure to use the slots it already controls deprives Newark passengers of flight options that would exist if the slots were flown.

2

4.       Yet United wants more.  It is now attempting to acquire 24 slots from one of its largest competitors at Newark, Delta Air Lines, Inc. ("Delta").  But with each additional slot it acquires, United reduces competition and forecloses entry or expansion of a rival that would otherwise use the slot to compete.  In doing so, United strengthens an already formidable barrier to competition at Newark.  In short, permitting United to acquire more slots would further entrench United's dominance at Newark and foreclose competition that is already in critically short supply.  As a result, passengers at Newark would face even higher fares and fewer choices.

## II.       DEFENDANTS AND THE TRANSACTION

5.       Defendant United Continental Holdings, Inc., the parent company of United Airlines, is a Delaware corporation headquartered in Chicago, Illinois.  United is the third largest airline in the world in terms of revenues.  Last year United flew over 138 million passengers to over 352 destinations throughout the world.  United has hubs in Newark, Chicago, Denver, Dulles Airport, Houston, Los Angeles, and San Francisco.

6.       Defendant Delta Air Lines, Inc., is a Delaware corporation headquartered in Atlanta, Georgia.  Delta is the second largest airline in the world in terms of revenues.  Last year Delta flew over 170 million passengers to over 316 destinations throughout the world.  Delta has hubs in Atlanta, Cincinnati, Detroit, John F. Kennedy International Airport ("JFK"), LaGuardia Airport, Los Angeles, Minneapolis-St. Paul, and Salt Lake City.

7.       On June 16, 2015, United and Delta entered into the transaction challenged here:  a so-called "slot lease agreement" pursuant to which Delta would lease to United 22 Newark slots that are usable year-round, and two Newark slots that are

usable during the March to October summer season, for $14 million.  The lease is long term and automatically renewable and, despite FAA regulation prohibiting the sale of Newark slots, is intended to effectuate a permanent transfer of the slots to United. This slot lease agreement gives United control over these Newark slots.

8.      Also on June 16, 2015, United and Delta entered into a separate slot lease agreement pursuant to which United leased to Delta 24 year-round, three summer, and three winter slots at JFK Airport (October to March), also for $14 million.  The lease is long term and automatically renewable, and is intended to effectuate a permanent transfer of the slots to Delta.  This slot lease agreement gives Delta control over these JFK slots. That transaction closed in June 2015.

### III.    JURISDICTION, INTERSTATE COMMERCE, AND VENUE

9.      The United States brings this action, and this Court has subject-matter jurisdiction over this action, under Section 4 of the Sherman Act, 15 U.S.C. § 4, to prevent and restrain United and Delta from violating Section 1 of the Sherman Act, and United from violating Section 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

10.      The defendants are engaged in, and their activities substantially affect, interstate commerce.  United and Delta each annually transport millions of passengers across state lines throughout this country, generating billions of dollars while doing so.

11.      Venue is proper under Section 12 of the Clayton Act, 15 U.S.C. § 22. This Court also has personal jurisdiction over each defendant.  Both defendants are found and transact business in this judicial district.

# IV.    BACKGROUND

A.    Slots Are a Barrier to Entry and Expansion at Newark

12.    Lack of access to slots constitutes a barrier to entry and expansion at Newark.  To serve Newark, the FAA requires that an airline have slots—operational authorizations allowing the carrier to take off and land during designated times of the day.  Newark is one of four airports in the United States on which the FAA has imposed slot restraints.  The FAA uses slot restraints to manage congestion and delay caused by the fact that demand for service exceeds the airport's capacity during certain times of day.

13.    At Newark, the FAA has imposed slot restraints from 6:00 A.M. to 10:59 P.M.  Each slot is associated with a particular half-hour window during which the carrier may perform either a takeoff or landing.  The FAA has limited Newark to 81 operations, or slots, per hour.  Not all of the 81 slots per hour have been allocated to carriers.  Some slots are available from the FAA, but undesirable because they are for time periods or days of the week that would not support a commercially viable service pattern without additional slots at time periods when slots are unavailable.

14.    Carriers may use their slots to serve any route out of Newark with aircraft of any size.  Thus, an airline can choose the destinations it will serve with its slots, and the capacity and frequency with which it will serve them.  Airlines continually reassess how to deploy their assets, and enter and exit routes as they seek to take advantage of profit opportunities.  Airlines at slot-controlled airports such as Newark deploy slots in different ways over time to respond to changes in consumer demand and competitive moves by their rivals.

5

15.     At slot-controlled airports, slots at times of peak demand are particularly scarce assets and have historically been concentrated in the hands of large airlines that have little incentive to sell or lease slots to carriers that are most likely to compete aggressively against them.  This is particularly true at Newark where United holds 73% of all allocated slots, the big three carriers (United, Delta, and American) together control 84%, and the significantly smaller slot holdings of low cost carriers and other domestic competitors at the airport are almost entirely the result of government intervention.

16.     Over the years, carriers other than the big three largely have been unable to secure the slots necessary to enter or expand.  For example, Virgin America tried to obtain Newark slots from the FAA for years before finally obtaining 15 slots in 2013.  As Virgin Group's founder, Richard Branson, explained: "It took us four years to get into Newark.  The slots were locked into the legacy carriers. . . . It was only when American went bankrupt that we actually managed to get some slots there."  JetBlue and Alaska Airlines have made similar attempts to add to their slim portfolios, but have been unable to obtain additional slots at commercially viable times.

17.     In the same vein, Alaska Airlines, Allegiant Air, Frontier Airlines, Spirit Airlines, and Virgin America have jointly advocated for reforms of the existing slot regimes at Newark and other airports, saying in a recent letter to the Department of Transportation and the FAA that they "have been frustrated in their attempts to obtain slots at commercially viable times of the day to provide this needed new service and competition at the NYC Airports."

B.      United is the Dominant Slot Holder at Newark

18.      United controls 902 of the 1,233 allocated slots at Newark, flies to 189

destinations on a nonstop basis using those slots, and is the monopoly nonstop carrier to

139 of those destinations.  United's slot holdings dwarf those of its competitors.  Delta,

the third largest slot holder at Newark, has only 64 slots and provides nonstop service to

just eight destinations.  American has 70 slots and serves six destinations on a nonstop

basis.  Low cost carriers Southwest and JetBlue are limited to 36 and 33 slots,

respectively, and each serves eight destinations on a nonstop basis.  The remaining

carriers provide even more limited service.  None has more than 25 slots or 2% of all

slots allocated at the airport; for example, Virgin America has just 15 slots, and Alaska

Airlines only four.

19.      The bulk of United's current slot portfolio was inherited from Continental

Airlines when it merged with United in 2010.  Before the merger, the two airlines

competed on nonstop service on four large domestic routes out of Newark.  At that time,

Continental held 894 slots at Newark and United held 36 slots.

20.      In response to the Department of Justice's concerns expressed during its

review of the United/Continental merger, United divested all of its 36 slots at Newark to

Southwest.  United's then-CEO, Jeff Smisek, touted the settlement:  "We think this

would be a fair solution that would allow Continental and United to create an airline that

will provide customers with an unparalleled global network and top-quality products and

services, while enhancing domestic competition at Newark."

21.      Nevertheless, United has attempted three times in the intervening years to

reverse the benefits to consumers of that divestiture by increasing its slot dominance at

Newark.  In July 2014, United presented to the Justice Department a proposal under which it would reacquire from Southwest the very 36 slots it had divested as a condition of its merger.  When the Department of Justice objected, United abandoned the transaction.  Several months later, in March 2015, United returned with a proposal to acquire 18 Newark slots from American in exchange for 26 slots at JFK.  When the Department of Justice again expressed competitive concerns about United's acquisition of additional slots at Newark, negotiations between United and American broke down and the deal was abandoned.  In June 2015, United returned once again with the current proposal to acquire 24 Newark slots, this time from Delta.

22.     The present transaction is the latest of United's efforts to buy up any additional slots that become available at Newark, despite United already owning more than it is willing to use.  Just before its merger with United, Continental acquired 13 slots from AirTran, and after it, the merged firm acquired an additional eight slots from Republic in two separate transactions.

C.     <u>United Does Not Use Many of the Slots it Already Controls at Newark</u>

23.     Even as United seeks to enhance its dominance at Newark with the acquisition of 24 additional slots, United holds many slots that it does not use.  Indeed, United "grounds" as many as 82 slots each day.  As illustrated in the chart below, United's unused slots exceed the slots, both used and unused, of each of its competitors:



24.     Despite its dominance of slots and stockpile of unused slots, United persists in its efforts to buy up more slots at Newark.  United has suggested the slots it proposes to acquire from Delta could allow it to provide service to a handful of new destinations and add frequencies to existing routes, though it has yet to commit to specific service plans.  But United's existing cache of excess slots would allow it to add flights at Newark if that were its true goal.

D.     Slots in the Hands of Rivals Force United to Compete

25.     When new entrants have acquired slots at Newark, they have forced United to compete on the merits, resulting in measurable benefits for consumers.  For example, when United divested 36 slots to Southwest in 2010 to address the Department of Justice's concerns with the United/Continental merger, Southwest initiated low fare service out of Newark.  United was forced to compete and fares dropped significantly. Southwest used the slots to enter the five nonstop routes from Newark listed below.  The

introduction of head-to-head competition against the merged United/Continental on these routes resulted in substantially lower fares to consumers and increased seats available to travelers:

| Route | Year-over-year Percentage Decrease in Average Fare | Year-over-year Percentage Increase in Number of Passengers |
|---|---|---|
| Newark-St. Louis | -27% | 66% |
| Newark-Houston | -15% | 53% |
| Newark-Phoenix | -14% | 57% |
| Newark-Chicago | -11% | 35% |
| Newark-Denver | -5% | 49% |

Passengers flying on these five nonstop routes after Southwest began service saved about $75 million annually compared to what they would have paid under United's substantially higher fares before Southwest's entry.

26.     Similarly, when Virgin America acquired slots from American in 2012 and launched service to Los Angeles and San Francisco in direct competition with United, United was forced to respond.  It substantially increased capacity and reduced fares on those routes.  Virgin Group's founder described the benefits of this fierce competition in a public interview:  "They've [United] slashed the fares by 40 percent to try to damage us.  Obviously, we've matched the fares. . . . The public is going to be very, very happy with that."  United later calculated that its pricing concessions on these two routes in response to Virgin's entry cost it approximately $66 million in annual revenue.

27.     By buying up additional slots at Newark, United strengthens an already substantial barrier to entry and expansion and forecloses competition from its rivals.  As past experience at Newark shows, such entry and expansion produces significant benefits for consumers.

# V.    RELEVANT MARKETS

28.    If permitted to proceed, anticompetitive effects from the proposed transaction would arise in at least two relevant antitrust markets:  the market for Newark slots, and the market for scheduled air passenger service between Newark and other destinations.

### A.    Takeoff and Landing Slots at Newark Airport

29.    Slots at Newark, particularly in peak hours, are difficult to obtain and only rarely change hands between airlines.  Even rarer are instances in which slots pass from one of the big three airlines to a low cost carrier or other competitor.  There are no alternatives to slots for airlines seeking to enter or expand service at Newark.

30.    Airlines do not view service at other airports as reasonable substitutes for service offered at Newark, and thus they are unlikely to switch away from slots at Newark in response to a small but significant increase in the price of slots.  Thus, slots at Newark constitute a relevant market under the antitrust laws.

### B.    Scheduled Air Passenger Service Between Newark and Other Destinations

31.    Air passenger service to and from Newark constitutes a relevant antitrust market.  The Department in the context of its reviews of airline mergers would typically examine each route from Newark to another airport as a relevant market itself or as part of a broader relevant market involving flights between two cities.  We analyze competition at the route level because we are able to see where competition between the two merging firms exists and analyze directly on which route harm is likely to occur.

32.     However, in this transaction, the asset that is being acquired is a package of slots, and those slots can be used on any route that the carrier holding the slots

chooses.  As a consequence, the impact of a slot transaction on particular routes will differ depending upon how the slots acquired will be used, which can and does change over time.   In other words, a slot is simply a form of capacity that can be shifted as needed to and from routes within the Newark airport as a whole.  Given that slots can be used to serve any route to or from Newark, it is appropriate to aggregate all routes that either originate or terminate in Newark for the purpose of defining a relevant market in which the transaction will cause anticompetitive harm.

33.     In addition, while LaGuardia and JFK offer service to many of the same cities served out of Newark, Newark is the most convenient airport for passengers traveling to or from locations in Northern New Jersey and portions of Manhattan.  Many passengers who live or work in these areas have a strong preference for Newark over LaGuardia and JFK, do not consider those other airports to be meaningful alternatives, and would not turn to them even if fares at Newark were to increase by a modest amount.

34.     A hypothetical monopolist over all scheduled air passenger service at Newark likely would increase fares on routes to and from Newark by, on average, at least a small but significant and non-transitory amount.  Thus, scheduled air passenger service to and from Newark is a relevant market under the antitrust laws.

## VI.    ANTICOMPETITIVE EFFECTS OF THE TRANSACTION

A.     <u>The Market for Scheduled Air Passenger Service Between Newark and Other Destinations and the Market for Slots at Newark Airport are Highly Concentrated and Would Become More So as a Result of the Proposed Transaction</u>

35.     Market concentration is one useful indicator of the level of competitive vigor in a market, and of the likely competitive effects of a transaction involving competitors.  The more concentrated a market, and the more a transaction would increase

concentration in a market, the more likely it is that a transaction would result in a meaningful reduction in competition. Concentration in relevant markets is typically measured by the Herfindahl-Hirschman Index ("HHI"). The Horizontal Merger Guidelines consider markets in which the HHI exceeds 2,500 points to be "highly concentrated." Horizontal Merger Guidelines, § 5.3. The Guidelines further consider post-acquisition increases in HHI of more than 200 points to be significant increases in concentration that are "presumed to be likely to enhance market power." *Id*.

36.    Slots are in essence units of capacity that can be deployed by carriers to serve any destination to or from Newark. Lack of access to slots constitutes a barrier to an airline's ability to provide air passenger service between Newark and other destinations in competition with United. A carrier's Newark slot holdings therefore provide a measure of its ability to compete for passengers at Newark, and each firm's share of Newark slots reflects its competitive significance in the air passenger service market.

37.    United's proposed acquisition of 24 slots from Delta would give United a market share of approximately 75% in the already highly concentrated Newark slots market, and a correspondingly high share in the Newark air passenger service market. United would be by far the largest holder of slots, dwarfing the second largest carrier, American, which controls just under 6%. The pre-acquisition HHI is 5440—double the level considered to be highly concentrated under the Horizontal Merger Guidelines. *Id*. The post-acquisition HHI would increase to 5710. The resulting change in concentration of 270 represents a significant increase in concentration. These facts create a strong

presumption that the transaction would enhance United's market power and harm competition at Newark.

38.     United's 73% share of Newark slots is consistent with other measures of concentration at the airport.  For example, United accounts for 73% of scheduled flights at Newark and 68% of seats.

B.     <u>The Proposed Transaction Would Diminish Delta's Competitive Significance at Newark, Foreclose Other Airlines from Obtaining Slots Needed to Compete Against United, and Reduce Service at Newark</u>

39.     As the largest airline at Newark by a substantial margin, United already enjoys market power, which its competitors, with their significantly smaller slot holdings, have limited ability to discipline.  United's large pool of Newark slots affords it tremendous flexibility to defend its dominance at Newark.  It can neutralize rivals' efforts to enter or expand by adding flights to the route or routes that are threatened, making it difficult for rivals to attract enough passengers to operate profitably.  By contrast, United's existing competitors and new entrants with very few slots are limited in their ability to add service or shift flights to other Newark routes to counter United's initiatives.

40.      If the proposed transaction is not enjoined, one immediate impact is that it would diminish Delta's ability to compete on routes served by United out of Newark, leaving Delta with only 40 slots to compete against United's 926.  Delta and United currently compete on domestic nonstop service to Delta's hubs in Atlanta, Cincinnati Detroit, and Minneapolis, and consumers have benefitted from this competition.  But with one-third fewer slots, Delta would need to cut back service to one or more of these cities or reschedule flights at less convenient times.  Moreover, with no slots to spare,

Delta would have no ability to add frequencies to counter initiatives by United, its only nonstop competitor on these routes.  Nor would Delta have slots available to launch new service or reinstate service to markets it once served in response to changes in consumer demand.

41.     The proposed transaction would also substantially reduce the likelihood of entry or expansion by other airlines at Newark.  As the third largest slot holder at Newark, Delta is one of the most promising sources of slots for new entrants seeking to serve the airport.  By agreeing to transfer these slots to United—the dominant firm—for $14 million, Delta has signaled its willingness to part with these valuable competitive assets.  In the hands of anyone other than United, these slots would result in more competition for United at Newark.  By contrast, if the slots are acquired by United, such competition is foreclosed.

42.     As the dominant carrier with 73% of the slots and 73% of the flights at Newark, United has a strong incentive to pursue a foreclosure strategy.  It stands to lose more than any other airline from entry or expansion by rivals because any new service is likely to introduce competition on one of its routes.  As a result, United has a greater incentive than any other Newark carrier, including Delta, to keep slots out of the hands of its competitors.  Delta is unlikely to face new entry or expansion on routes serving its hubs.  United's incentive and ability to engage in foreclosure strategies at Newark would increase with an increase in the number of slots it controls.

43.     The transaction likely would also result in reduced service at Newark, pushing up fares and leaving passengers with less choice.  United's portfolio of 902 Newark slots permits the operation of as many as 451 roundtrip flights each day.  On

average, however, United only operates 386 roundtrip flights each day at Newark.  By consciously limiting its Newark capacity, United is able to raise fares to and from the airport.  And with significantly fewer slots, United's competitors have little ability to adjust frequencies to respond to United's capacity reductions.  Thus, United can reduce service on a route without fear that its rivals will enter or expand and steal business.  The proposed transaction would make this dynamic worse since it would reduce the number of slots that could be deployed to compete against United.

## VII.  MONOPOLY MAINTENENCE

44.     United's control of 73% of the slots at Newark gives it monopoly power over the markets for Newark slots and Newark scheduled air passenger service.  United is already exercising this monopoly power, and has long been able to extract a "Newark premium" for its service.  Indeed, airfares at Newark are among the highest in the country and service ranks among the worst.

45.      United now seeks to maintain and enhance its monopoly power by acquiring 24 additional slots from one of its largest competitors at Newark, Delta.  The addition of 24 slots to United's existing cache would further enhance its existing monopoly power as well as its ability to maintain and reinforce the high entry barriers faced by competitors seeking to enter or expand at Newark.

## VIII.  ABSENCE OF COUNTERVAILING FACTORS

46.     New entry or expansion by existing competitors is unlikely to prevent or remedy the transaction's likely anticompetitive effects.  United's rivals cannot easily enter or expand service at Newark due to the limited availability of slots as well as other barriers to entry.

47.     There are no transaction-specific efficiencies that outweigh the likely competitive harms of the proposed transaction.  United claims it will use the 24 slots it proposes to acquire from Delta to serve a handful of new destinations and add frequencies to existing routes.  On this basis, United asserts that the transaction would result in network efficiencies and benefits to consumers.  But United has yet to commit to a specific service plan, and it already has dozens of extra slots at its disposal should it wish to add new service.  Passengers at Newark will be better off if United is forced to compete on the merits for their business.

## IX.  VIOLATIONS ALLEGED

48.     The proposed transaction is a contract that would unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

49.     Through the proposed transaction and other actions, United is monopolizing and/or maintaining and enhancing its current monopoly over the markets for Newark slots and for scheduled air transportation in Newark in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

50.     Unless enjoined, the proposed transaction would impose a permanent structural change at Newark that is likely to have the following effects, among others:

(a)     The elimination of actual and potential competition between United and Delta at Newark;

(b)     The substantial reduction of Delta's competitive presence at Newark;

(c)     The removal of an additional 24 slots from competition with United, thereby further enhancing United's market power;

(d)      The further extension of barriers to entry and expansion at Newark by

United's rivals;

(e)      The increase in United's ability to remove capacity from the Newark

markets; and

(f)      The further entrenchment and enhancement of United's already dominant

position at Newark.

## X.   REQUEST FOR RELIEF

51.      Plaintiff, the United States of America, requests:

(a)      That the proposed Newark slot lease agreement between United and Delta

be adjudged to violate Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2;

(b)      That Defendants be permanently enjoined from and restrained from

carrying out the proposed acquisition or any similar acquisition that would result

in United acquiring control of slots from Delta at Newark;

(c)      That United be required to notify the Antitrust Division of the U.S.

Department of Justice at least 90 days in advance of any acquisition, lease, or

agreement whereby United assumes long-term control of slots at Newark within

the next five years;

(d)      That Plaintiff be awarded its costs of this action; and

(e)      That Plaintiff be awarded such other relief as the Court may deem just and

proper.

Dated this 10th day of November 2015.

Respectfully submitted,

FOR PLAINTIFF UNITED STATES:

William J. Baer
Assistant Attorney General for Antitrust

Renata B. Hesse
Deputy Assistant Attorney General

David I. Gelfand
Deputy Assistant Attorney General

Eric Mahr
Director of Litigation

Patricia A. Brink
Director of Civil Enforcement

Kathleen S. O'Neill
Chief
Transportation, Energy & Agriculture Section

Caroline E. Laise
Assistant Chief
Transportation, Energy & Agriculture Section

Robert D. Young
Attorney
Antitrust Division
U.S. Department of Justice
450 Fifth Street, N.W., Suite 4100
Washington, DC  20530
Telephone: (202) 353-7131
Facsimile: (202) 307-2784
E-mail: robert.young@usdoj.gov

Amanda D. Klovers
Don P. Amlin
Julie Scharfenberg Elmer
Andrew S. Garver
Paul J. O'Donnell

Attorneys for the United States

Local Counsel for Plaintiff:

PAUL J. FISHMAN
United States Attorney
(Designated Local Counsel)
By: LETICIA B. VANDEHAAR
Assistant United States Attorney
Deputy Chief, Civil Division
970 Broad Street, Suite 700
Newark, New Jersey 07102
Telephone: (973) 297-2036
E-mail: leticia.vandehaar@usdoj.gov

**LOCAL CIVIL RULE 11.2 CERTIFICATION**

Pursuant to Local Civil Rule 11.2, I certify that the matter in controversy alleged in the foregoing Complaint is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

Kathleen S. O'Neill
Chief, Transportation, Energy & Agriculture Section
U.S. Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 8000
Washington, D.C. 20530
Telephone: (202) 307-2931
Facsimile: (202) 307-2784
E-mail: kathleen.oneill@usdoj.gov

**LOCAL CIVIL RULE 101.1 DESIGNATION OF AGENT FOR SERVICE**

Pursuant to Local Civil Rule 101.1(f), because the Antitrust Division (the "Division") does not have an office in this district, the United States Attorney for the District of New Jersey is hereby designated as eligible as an alternative to the Division to receive service of all notices or papers in the above-captioned action.  Therefore, service upon the United States Attorney's Office for the District of New Jersey, 970 Broad Street, 7th Floor, Newark, New Jersey 07102, will constitute service upon the Division for purposes of this action.

Kathleen S. O'Neill
Chief, Transportation, Energy & Agriculture
Section
U.S. Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 8000
Washington, D.C. 20530
Telephone: (202) 307-2931
Facsimile: (202) 307-2784
E-mail: kathleen.oneill@usdoj.gov